**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5129-15T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FRANCIS G. LANGLEY, a/k/a
FRANCIS G. LANGLEY, JR., and
FRAN LANGLEY,

    Defendant-Appellant.
_____

Submitted August 8, 2017 — Decided September 13, 2017

Before Judges Hoffman and Currier.

On appeal from Superior Court of New Jersey, Law Division, Cape May County, Indictment Nos. 13-07-0720 and 15-01-0008.

Joseph E. Krakora, Public Defender, attorney for appellant (Jay L. Wilensky, Assistant Deputy Public Defender, of counsel and on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Jane C. Schuster, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Francis G. Langley appeals from two judgments of conviction entered by the trial court on February 27, 2015. Pursuant to a plea agreement covering two separate indictments, the judgments of conviction declared defendant guilty of second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b), and fourth-degree resisting arrest, N.J.S.A. 2C:29-2(a)(2). The judge sentenced defendant to a five-year term of imprisonment with no eligibility for parole on the weapons conviction and a concurrent eighteen-month term on the resisting arrest conviction. Defendant then moved for bail pending appeal, which the sentencing judge denied.

On appeal, defendant challenges the judge's pretrial ruling of April 9, 2014, following a hearing on April 1, 2014, denying his motion to suppress physical evidence seized by police. He also challenges the judge's pretrial ruling of January 5, 2015, following a hearing on that date, denying his motion to suppress his statements to police. Defendant further appeals the denial of his post-sentence motion to withdraw his guilty plea. He presents the following points for our consideration:

> POINT I
>
> USE OF THE WEAPON SEIZED HERE IN A CRIMINAL PROSECUTION IS PROHIBITED UNDER THE DOMESTIC VIOLENCE ACT, AND NOT JUSTIFIED UNDER THE COMMUNITY CARETAKING DOCTRINE. ACCORDINGLY, SUPPRESSION SHOULD HAVE BEEN GRANTED. U.S.

CONST., AMEND[S]. IV, XIV; <u>N.J. CONST.</u> (1947), ART. 1, PAR 7.

POINT II

THE MOTION COURT'S RULING AS TO SUPPRESSION OF PHYSICAL EVIDENCE WAS BASED ON UNADMITTED "EVIDENCE," AND IS ACCORDINGLY INVALID AND MUST BE VACATED. <u>U.S. CONST.</u>, AMENDS. VI, XIV; <u>N.J. CONST.</u> (1947), ART. 1, PAR 10. (NOT RAISED BELOW)

POINT III

THE DEFENDANT'S STATEMENTS WERE TAKEN IN THE ABSENCE OF NECESSARY <u>MIRANDA</u> WARNINGS, AND ACCORDINGLY MUST BE SUPPRESSED. <u>U.S. CONST.</u>, AMEND[S]. V, XIV.

POINT IV

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO WITHDRAW HIS PLEA. <u>U.S. CONST.</u>, AMEND. XIV; <u>N.J. CONST.</u> (1947), ART. 1, PAR. 9.

Finding no merit in these arguments, we affirm. We address the facts and law relating to each point in turn.

I.

At the April 1, 2014 suppression hearing, the State presented testimony from Sergeant John Mazzuca of the Ocean City Police Department. Sergeant Mazzuca stated that on June 27, 2013, at approximately 8:30 p.m., dispatch directed him to a "domestic dispute" at a residence on Coolidge Road, which a neighbor had reported to 9-1-1. Dispatch notified the sergeant that a prior disturbance had occurred at the residence and

defendant "had returned to the property and . . . forcibly entered the rear door."

Sergeant Mazzuca arrived at the residence "almost simultaneously" with two other police officers. Defendant's mother-in-law met the officers as they approached and informed them that defendant and his wife, N.L., were "arguing and fighting inside" and that defendant was "screaming" at her. The officers also learned that N.L.'s children fled the residence during the fight.

Sergeant Mazzuca went inside the residence and heard a male voice yelling. He entered a bedroom to find defendant and N.L.; he observed N.L. "visibly shaken," upset, crying, and "distraught because she felt her marriage was going away." The officers then separated defendant and N.L. to speak with them individually. Sergeant Mazzuca spoke with defendant in the bedroom, who told him that he and N.L. "just had a verbal dispute and no physical altercation had taken place." Consistent with this explanation, the sergeant did not notice any signs of physical injury and saw defendant "was packing up his stuff to leave."

One of the other officers then entered the room and informed Sergeant Mazzuca about his conversation with N.L.; she stated defendant "told her to get a shotgun that was under the

bed and load it and blow her head off." Police moved defendant to a different bedroom where he admitted he made this statement, adding that he "just thought she was suicidal" and "it was a bad choice of words to make." The officers also asked defendant if he had a shotgun; defendant admitted he had an unloaded shotgun under his bed in the prior room and gave the officers permission to check. Defendant further admitted to having a crossbow in his closet.

Sergeant Mazzuca next inquired whether defendant had any prior criminal convictions. Defendant replied that he had been convicted of "theft from a vehicle." At that point, the officers decided to seize the weapons, "partially for that reason and also for the safety of his wife, who he had claimed was suicidal." They retrieved the weapons from the locations defendant indicated.

Sergeant Mazzuca testified that prior to this incident he had encountered defendant during a "motor vehicle stop." Based upon this previous involvement, he believed "there was a strong possibility that [defendant] was a certain person not to possess a weapon." However, the sergeant acknowledged he "was going to have [to] research" the statute to make certain.

Sergeant Mazzuca also discussed with N.L. whether she wanted to pursue a restraining order against defendant. When

she responded that she did, he drove her to the police headquarters. After N.L. "calmed down" at the station, Sergeant Mazzuca noted he "did not feel she was a threat to commit suicide at that point." He acknowledged the only indication that N.L. was suicidal was defendant's statement at the residence. However, he clarified that during his time at the residence, "it was not [yet] determined whether she was or wasn't [suicidal]," and the officers were acting under the possibility that she "could be."

The officers conducted a criminal history check of defendant at the station, which revealed "a number of felony convictions," including some for burglary. Sergeant Mazzuca noted that a burglary conviction qualifies an individual as a certain person not to possess a weapon.

In a written opinion, the motion judge denied defendant's motion to suppress the shotgun under two separate legal theories. First applying the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, the judge found "the illegal nature of the weapons was immediately apparent when [d]efendant told the police officers that he had been convicted of 'car theft,' thus making him a certain person not to have weapons." She added that defendant had no reasonable expectation of privacy in his criminal records, and thus the

records check "was not a search." Second, the judge determined the search and seizure were permissible under the "emergency aid doctrine," which she termed "a subcategory of [the] community caretaking exception" to the warrant requirement. The judge concluded that the possibility N.L. might have harmed herself gave the officers "an objectively reasonable basis to believe that an emergency required immediate assistance to preserve life or prevent serious injury."

Defendant now argues the motion judge erred because neither the PDVA nor the community-caretaking exception supported denial of suppression. However, having reviewed the applicable law, we are satisfied the judge appropriately denied suppression under the emergency-aid doctrine.

When reviewing a motion to suppress, we "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence on the record." State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)). "Those findings warrant particular deference when they are 'substantially influenced by [the trial judge's] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" Ibid. (alteration in original) (quoting Robinson, supra, 200 N.J. at 15). "To the

extent that the trial court's determination rests upon a legal conclusion, we conduct a de novo, plenary review." Ibid.

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures." State v. Minitee, 210 N.J. 307, 318 (2012) (citing U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7). Searches and seizures conducted without a warrant, "particularly in a home, are presumptively unreasonable." State v. Edmonds, 211 N.J. 117, 129 (2012) (quoting State v. Bolte, 115 N.J. 579, 585 (1989)). As such, the State has the burden of proving that such searches and seizures are "justified by one of the '"well-delineated exceptions" to the warrant requirement.'" State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598, cert. denied, 543 U.S. 876, 125 S. Ct. 108, 160 L. Ed. 2d 128 (2004)).

The exceptions to the warrant requirement include the emergency-aid and community-caretaking doctrines. State v. Hathaway, 222 N.J. 453, 468 (2015); State v. Keaton, 222 N.J. 438, 452 (2015). Under the community-caretaking doctrine, "[c]ourts have allowed warrantless searches . . . when police officers have acted not in their law enforcement or criminal investigatory role, but rather in a community caretaking

function."  State v. Bogan, 200 N.J. 61, 73 (2009).  Our Supreme Court has held that the community-caretaking doctrine prohibits "the warrantless entry into or search of a home in the absence of some form of exigent circumstances" or "objectively reasonable emergency."  State v. Vargas, 213 N.J. 301, 305, 321 (2013).

However, the Court made clear that "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement."  Id. at 323.  "The emergency aid doctrine is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, . . . to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury."  Hathaway, supra, 222 N.J. at 469 (quoting Frankel, supra, 179 N.J. at 598).

Courts apply a "two-prong test" that considers "the totality of the circumstances" to determine whether the emergency-aid doctrine justifies a warrantless search of a home. Id. at 470, 474.  The State must show that "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a

reasonable nexus between the emergency and the area or places to be searched." Ibid. (quoting Edmonds, supra, 211 N.J. at 132). The doctrine does not require "certitude" of danger but only reasonable belief that immediate action is required. Ibid. (quoting Frankel, supra, 179 N.J. at 599). Reasonableness turns on the circumstances at the time and "does not depend on whether it is later determined that the danger actually existed." Ibid.

If an emergency exists, "[t]he emergency-aid doctrine, particularly when applied to the entry of the home, must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, supra, 211 N.J. at 134 (quoting Frankel, supra, 179 N.J. at 599). "When the exigency that justifies immediate action dissipates, the rationale for searching without a warrant is no longer present." Ibid.

Defendant does not dispute that police had the authority to enter the home due to a report of domestic violence, but he argues the emergency-aid doctrine does not apply to the gun search because the PDVA governs the events in question. However, we have noted that exceptions to the warrant requirement still apply to searches that implicate the PDVA. See State v. Perkins, 358 N.J. Super. 151, 161 (App. Div. 2003) ("[U]nless the factual circumstances justify a search under a recognized exception to the warrant requirement, a search and

resulting seizure under [the PDVA] is deemed reasonable . . . so long as the results are not used to facilitate a criminal prosecution."). Moreover, in Edmonds, supra, 211 N.J. at 139-40, the Court considered the emergency-aid doctrine in the context of a domestic violence call. Because police discovered no evidence of a domestic disturbance upon entering a residence, the Edmonds Court concluded there was no objectively reasonable basis to search the home. Id. at 121-22.

Here, we conclude that the officers had an objectively reasonable basis to believe that a danger to life required immediate assistance, and that there was a nexus between the emergency and the area searched. Officer Mazzuca observed N.L. was "distraught," and defendant stated she might be suicidal and that he told her to take his shotgun and "blow her head off." Based on these circumstances, the officers reasonably searched the locations indicated to secure the shotgun and crossbow. They did not expand their search beyond these specific areas. Although the officers had separated defendant and N.L. at the time of the search, the officers' actions were reasonable to prevent the possibility that N.L. might harm herself.

We are therefore satisfied that the motion judge correctly applied the emergency-aid doctrine to uphold this search and seizure. We further note that the criminal history check of

11

defendant was lawful, as our Court has held that criminal background checks are not searches under the state or federal constitutions. See State v. Sloane, 193 N.J. 423, 436 (2008). As such, we need not address defendant's arguments relating to the judge's application of the PDVA.

## II.

In Point II, defendant urges this court to vacate the judge's ruling denying suppression of the physical evidence, contending the judge improperly based her written opinion on "unadmitted" evidence outside of the April 1, 2014 motion record. Specifically, in her recitation of the background facts, the judge apparently referenced information from police reports and the neighbor's 9-1-1 calls, which were not testified to at the motion hearing. Defendant further challenges the judge's interpretation of certain facts relating to Sergeant Mazzuca's understanding of his prior convictions.

We reject these arguments and need not consider them at length. As discussed above, the testimony elicited at the motion hearing was sufficient to support the judge's ruling. Moreover, the State provided the court with the police reports and audio of the 9-1-1 calls in the appendix to its motion brief. The judge stated on the record that she had both parties' briefs, and defense counsel did not object. Because

12

defendant has failed to show plain error, R. 2:10-2, we decline to disturb the judge's ruling on this basis.

                                    III.

Defendant next challenges the judge's January 5, 2015 ruling, denying suppression of his statements to police. At this second hearing, the State presented testimony from Ocean City Police Officer Joshua Clarke, who was with Sergeant Mazzuca at the subject residence. Officer Clarke spoke with N.L., who stated defendant told her to "take my shotgun and kill yourself"; she informed the officers that defendant kept a shotgun underneath the bed. Officer Clarke thus became concerned there were weapons on the premises and went to speak with defendant. Pursuant to department protocol, he planned to "secure the scene" and temporarily seize any firearms.

Defendant complied with the officers' request to move from the master bedroom to the children's bedroom. While speaking with Officer Clarke, defendant "seemed frustrated and agitated with the situation" and said his comments "were a stupid thing to say." Defendant "said that he did keep a shotgun underneath the bed," "pointed to the bedroom [the officers] were standing across the hallway from," and gave them permission to check. According to Officer Clarke, defendant "volunteered" this information, and he was not under arrest at this time. Officer

Clarke acknowledged that the officers did not give defendant Miranda[1] warnings during this exchange.

After the officers seized the weapons, defendant asked if he was free to leave. The officers "allowed him to gather up some things and then he . . . was free to go." Defendant left the residence, approximately forty minutes after police first arrived.

The officers later checked defendant's criminal history at the police station and then returned to the residence to arrest him. According to the arrest report, defendant listed his home address as the Coolidge Road residence where these events transpired.

The motion judge denied defendant's suppression motion in an oral opinion, concluding police did not need to give him Miranda warnings because he was not subjected to a custodial interrogation. The judge noted defendant "voluntarily provided information to the police while in his own home and before any indication that he would be questioned or taken into custody." She found the police moved defendant to the children's bedroom not to conduct a custodial interrogation but to "secure the scene and to secure the safety of the officers and to secure the persons in the home." The judge determined that the officers

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1062, 16 L. Ed. 2d 694 (1966).

were conducting an investigation, and thus "[a]n objectively reasonable man would not [have] felt his freedom was compromised in any significant way given these circumstances."

Defendant now argues the motion judge erred by finding the officers did not subject him to a custodial interrogation. As noted, we grant deference to the judge's factual findings and review her legal conclusions de novo. Rockford, supra, 213 N.J. at 440.

It is well established that police officers must provide Miranda warnings when they conduct a custodial interrogation, which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, supra, 384 U.S. at 444, 86 S. Ct. at 1612, 16 L. Ed. 2d at 706. Custodial interrogations that trigger the obligation to provide Miranda warnings do not require physical restraint and may take place in the suspect's home. State v. Hubbard, 222 N.J. 249, 266 (2015). When not in custody, an accused has no Miranda protection because there is no police-dominated atmosphere, which forms the basis for the United States Supreme Court's Miranda jurisprudence. State v. Nyhammer, 197 N.J. 383, 406 (citing Beckwith v. United States, 425 U.S. 341, 346-47, 96 S.

Ct. 1612, 1616, 48 L. Ed. 2d 1, 7-8 (1976)), cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009).

A court must consider the totality of the circumstances in determining whether an individual is in custody. State v. Milledge, 386 N.J. Super. 233, 244 (App. Div.), certif. denied, 188 N.J. 355 (2006). "Pertinent factors include the duration of the detention, the nature and degree of the pressure applied to detain the individual, the physical surroundings of the questioning and the language used by the officer in summoning the individual." Ibid. (quoting State v. Pierson, 223 N.J. Super. 62, 67 (App. Div. 1988)). "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." State v. P.Z., 152 N.J. 86, 103 (1997).

We consider these standards when police questioning stems from a reported domestic dispute. See State v. Smith, 374 N.J. Super. 425, 431-32 (App. Div. 2005). "When considering the need for Miranda warnings before questioning in a private residence, our courts have not viewed the home as a location so isolated or dominated by the police as to lead the reasonable person to

conclude he or she is in custody or in danger of abuse." <u>Id.</u> at 432. Though "police action subsequent to entering [a] residence is likely to involve some restraint on the occupants' freedom of action," we have analogized the detention involved "to field investigations of suspicious conduct authorized by <u>Terry v. Ohio</u>, 392 <u>U.S.</u> 1, 88 <u>S. Ct.</u> 1868, 20 <u>L. Ed.</u> 2d 889 (1968), and traffic stops authorized by <u>Berkemer v. McCarty</u>, 468 <u>U.S.</u> 420, 104 <u>S. Ct.</u> 3138, 82 <u>L. Ed.</u> 2d 317 (1984)." <u>Smith</u>, <u>supra</u>, 374 <u>N.J. Super.</u> at 431. In doing so, we held that, absent circumstances equivalent to arrest, in-home questioning is insufficient to rise to the level of custody necessitating <u>Miranda</u> warnings. <u>Id.</u> at 431-33.

Additionally, where a defendant is merely "the subject of an officer's attempt to gather information, the required compulsion is not present to necessitate <u>Miranda</u> warnings." <u>State v. Dispoto</u>, 383 <u>N.J. Super.</u> 205, 214 (App. Div. 2006), <u>aff'd in part and modified in part</u>, 189 <u>N.J.</u> 108 (2007).

Applying these principles, we find there are more than sufficient grounds to treat the events under review as a non-custodial situation. The officers properly entered defendant's home in order to investigate a reported domestic disturbance. After hearing N.L.'s statement that a weapon was located under the bed, they moved defendant to a different room to secure the

scene and asked him limited questions to investigate N.L.'s account. Defendant voluntarily told the officers he kept a shotgun under his bed and gave them permission to check. The officers did not pressure defendant or place him under arrest, he was in his own home the entire time, and he was free to leave after police seized the weapon.

Under these circumstances, we conclude an objectively reasonable person would not have believed they were in police custody during these events. See Smith, supra, 374 N.J. Super. at 432. In the absence of custodial interrogation, Miranda warnings were not required and the motion judge did not err by declining to suppress defendant's statements. We therefore discern no basis to disturb the judge's ruling.

IV.

Last, defendant argues the judge should have granted his motion to withdraw his guilty plea. This issue is governed by the four-factor test expressed by our Supreme Court in State v. Slater, 198 N.J. 145, 157-58 (2009): "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal would result in unfair prejudice to the State or unfair advantage to the accused."

Courts must balance all of the factors in deciding the motion for withdrawal of a guilty plea. Id. at 162. As no factor is mandatory, the fact that one may be missing "does not automatically disqualify or dictate relief." Ibid.

With regard to the first Slater factor, "[a] bare assertion of innocence is insufficient to justify withdrawal of a plea." Id. at 158. The defendant must present specific and credible facts "and, where possible, point to facts in the record that buttress [his or her] claim." Ibid. Courts may look to evidence that was available to the parties when the defendant entered his plea. Id. at 158-59. Courts should not conduct a "mini-trial" but should "simply consider whether a defendant's assertion of innocence is more than a blanket, bald statement and rests on particular, plausible facts." Id. at 159.

Regarding the second Slater factor, a defendant has adequate reason to withdraw his or her plea where the court or prosecutor misinforms the defendant about an element of the plea, or where "the defendant was not informed and thus did not understand" material terms and consequences of the plea. Ibid.

The record shows that several months after sentencing, defendant moved to withdraw his plea, or in the alternative, for reconsideration of his motion for bail pending appeal. In support of this motion, defendant claimed he only pled guilty

19

because his attorney told him he would receive bail pending his appeal if he did so. Defendant further asserted his innocence, claiming the shotgun police recovered actually belonged to his son, and it arrived at N.L.'s residence after he moved out. Defendant submitted a letter and affidavit from his plea counsel and affidavits from friends and family members to support these claims.

Following a hearing on February 4, 2016, the judge[2] denied defendant's motion to withdraw his plea. Applying the Slater factors, the judge found defendant had not asserted he was innocent or demonstrated sufficient reasons for withdrawal; rather, he "simply no longer wants [to] deal with the consequences of the plea." The judge noted defendant entered his plea pursuant to an agreement, and she found that withdrawal would unfairly prejudice the State, which was prepared to go to trial. The judge also rejected defendant's claim that he was led to believe he would receive bail pending appeal, citing the plea transcript and other portions of the record that showed he was aware the State was opposing his motion. She noted that any claims regarding his attorney's advice were appropriate for post-conviction relief (PCR).

---

[2]    A different judge conducted defendant's plea withdrawal hearing.

Defendant now argues the judge erred in her application of the Slater factors. We disagree. First, although defendant submitted affidavits stating the shotgun was not his, the suppression record shows defendant freely admitted to possessing the shotgun. The record further shows that at the time of his arrest, defendant told police he lived at the address where they seized the shotgun. For these reasons, we find defendant did not base his assertion of innocence upon credible facts.

Second, the record shows defendant was informed he was not guaranteed bail upon pleading guilty. At his plea hearing, defendant affirmed he understood that the State was going to object to his application for bail pending appeal. His plea form further noted the State would oppose bail. As the judge appropriately noted, any claims defendant has against his attorney are appropriate for PCR. Similarly, we find the judge correctly balanced the remaining Slater factors to deny defendant's motion. We discern no basis to reverse.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5129-15T1